**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**KRISTOPHER STEPPS**                                                                                **PLAINTIFF**

**v.**                                   **Case No. 4:21-cv-00986-LPR**

**THE BOARD OF TRUSTEES
OF THE UNIVERSITY OF ARKANSAS,
and THOMAS SCHULZ
(in his individual and official capacities)**                                          **DEFENDANTS**

<u>**ORDER**</u>

        This case arises from the nonrenewal of Plaintiff Kristopher Stepps's medical residency

contract.  Dr. Stepps alleges that this nonrenewal constituted racial discrimination and retaliation

for a discrimination complaint he made against a supervisory doctor.[1]  The Defendant, Dr. Thomas

Schulz, disagrees.[2]  Dr. Schulz argues that Dr. Stepps's complaint had nothing to do with the

nonrenewal of his contract, but rather that Dr. Stepps's contract was not renewed due to repeated

---

[1] Pl.'s Second Am. Compl. (Doc. 20) ¶¶ 26–49.  Dr. Stepps also alleges that he suffered unlawful race discrimination (and perhaps retaliation) prior to the nonrenewal of his contract.  But such claims fail because the employment actions underlying them occurred more than four years before the filing of the original Complaint in this case.  Both parties agree, as does the Court, that § 1981 claims have a four-year statute of limitations.  *See* Def.'s Br. in Supp. of Mot. for Summ. J. (Doc. 29) at 18–19; Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 33) at 11–12.  The original Complaint was filed on October 29, 2021.  *See* Doc. 1.  So any employment action occurring before October 29, 2017, cannot be the basis of the discrimination and retaliation claims brought by Dr. Stepps.  Based on the facts set forth in the Background Section below, that means the only employment action possibly at issue here is the nonrenewal of Dr. Stepps's contract.  (Of course, earlier events can be used to the extent they provide circumstantial evidence concerning whether the nonrenewal was discriminatory or retaliatory.)

[2] Although Plaintiff's Second Amended Complaint purports to bring this action against Dr. Schulz and the Board of Trustees of the University of Arkansas, the Complaint specifies that the two claims at issue in this case are brought only against Dr. Schulz.  *See* Pl.'s Second Am. Compl. (Doc. 20) at 6, 10.  The Clerk is directed to terminate the Board of Trustees of the University of Arkansas as a party Defendant.  Furthermore, to the extent that Plaintiff has attempted to state claims against Dr. Schulz in his official capacity, the Court has already held that Plaintiff does not have standing with regard to the relief he seeks.  *See* Sept. 6, 2022 Order (Doc. 19) at 7 ("But—and this is a big but— Dr. Stepps lacks standing to pursue reinstatement and expungement of his resident file.")  Therefore, any such claims are dismissed.  The only live claims in this action are Plaintiff's discrimination and retaliation claims against Dr. Schulz in his individual capacity.  *See* Nov. 4, 2023 Summ. J. Hr'g Tr. (Rough) at 40–42.  In any event, the Court notes that its summary judgment decision on the live claims pending against Dr. Schulz means that any official-capacity claims against Dr. Schulz or the Board of Trustees of the University of Arkansas would not get past summary judgment.

performance issues, patient care concerns, and a lack of improvement after substantive feedback and remediation opportunities.  Pending before the Court is Defendant's Motion for Summary Judgment.[3]  For the reasons stated below, the Court GRANTS the Motion for Summary Judgment in its entirety.

## BACKGROUND[4]

On July 1, 2016, Dr. Stepps began his first year of medical residency.[5]  Much of the relevant action in this case takes place during Dr. Stepps's medical residency.  But this case can be better understood if we reach back to the years leading up to 2016 before we explore what happened during Dr. Stepps's medical residency.

## I.    Medical School and the Match

Medical school is hard.  In addition to rigorous academic and practical coursework, students face daunting standardized exams.  More specifically, the United States Medical Licensing Examiners (USMLE) administers a series of three exams that aspiring doctors must take in order to progress through medical school and into residency.[6]  Students typically take the Step 1 exam at the end of the second year of medical school.[7]  A student must pass the Step 1 exam to

---

[3] Def.'s Mot. for Summ. J. (Doc. 28).

[4] Where a defendant moves for summary judgment, the Court relies on (1) undisputed facts, and (2) genuinely disputed facts construed in the light most favorable to the plaintiff.  Essentially, the Court considers the most pro-plaintiff version of the record that a reasonable jury could conclude occurred.  There is, however, a quirk here.  Dr. Stepps failed to file a response to the Defendant's Statement of Facts (Doc. 30) pursuant to Local Rule 56.1.  *See* Nov. 4, 2023 Summ. J. Hr'g Tr. (Rough) at 44–45 (admitting to failing to comply with the rule).  Local Rule 56.1(c) provides that "[a]ll material facts set forth in the statement filed by the moving party pursuant to [Local Rule 56.1(a)] shall be deemed admitted unless controverted by the statement filed by the non-moving party under [Local Rule 56.1(b)]."  *See* Local Rule 56.1(c) (E.D. Ark).  Accordingly, the Court treats Defendant's Statement of Facts as having been deemed admitted by Dr. Stepps for the purposes of summary judgment.  *See* Nov. 4, 2023 Summ. J. Hr'g Tr. (Rough) at 47–48.

[5] *See* Stepps Dep. (Doc. 33-1) at 16.

[6] *See* Schulz Dep. (Doc. 33-2) at 110; Def.'s Statement of Material Facts (Doc. 30) at 1.

[7] *See* Def.'s Statement of Material Facts (Doc. 30) at 1.

progress to the clinical clerkships that mark the third and fourth years of medical school (and, ultimately, to graduate from medical school).[8]  The Step 2 exam is usually taken after a student completes his or her third-year clinical rotations, as the exam tests a student's clinical knowledge and skills.[9]  The third and final exam is administered during a new doctor's post-schooling medical residency.[10]

Dr. Stepps struggled during medical school.[11]  He struggled with his coursework, and even had to repeat two courses.[12]  Dr. Stepps also struggled with the standardized exams.  It took him three attempts to pass the Step 1 exam, and three attempts to pass the Step 2 exam.[13]  Dr. Stepps took an extra year to graduate from the University of Arkansas for Medical Sciences (UAMS), ultimately receiving his medical degree on January 21, 2016.[14]

Given Dr. Stepps's medical school struggles, it is not wholly surprising that he also struggled to find a post-medical school residency program.  It is worth explaining how he ultimately landed at the UAMS Internal Medicine Residency Program in northwest Arkansas.

---

[8] *See* Schulz Dep. (Doc. 33-2) at 110–11; Def.'s Statement of Material Facts (Doc. 30) at 1–2; Stepps Dep. (Doc. 33-1) at 8.  During the third and fourth years of medical school, students are assigned to rotations, and in their fourth year, students can tailor their experiential learning to their specialty of interest.  *See* Stepps Dep. (Doc. 33-1) at 10.

[9] *See* Def.'s Statement of Material Facts (Doc. 30) at 1 ("Step 2 of the exam is typically taken in the fall of the third year of medical school and includes testing a student's clinical knowledge and skills."); *see also* Schulz Dep. (Doc. 33-2) at 111 ("There was a [S]tep 2 clinical knowledge, which is a written exam, which is taken generally in the fall of the junior year, or the M3 year, of medical school.").  Although there is some conflict in the record as to when students typically take the Step 2 exam, the Court understands the record to support a reasonable inference that the Step 2 exam is typically taken after a medical student completes their third-year clinical requirements.  Either way, this ambiguity as to the general Step 2 exam timeline is not material, as the record is clear that Dr. Stepps's multiple attempts to pass the Step 2 exam placed him behind schedule as to the path taken by a typical medical student.

[10] *See* Schulz Dep. (Doc. 33-2) at 93 (explaining that a passing score on the Step 3 exam during residency is required to become licensed).

[11] *See, e.g.*, Def.'s Statement of Material Facts (Doc. 30) at 1–15.

[12] *See id.  See also* Stepps Dep. (Doc. 33-1) at 8 ("I had to retake the exam while retaking the course.").

[13] *See* Nov. 4, 2023 Summ. J. Hr'g Tr. (Rough) at 10;  Def.'s Statement of Material Facts (Doc. 30) at 2.

[14] *See* Nov. 4, 2023 Summ. J. Hr'g Tr. (Rough) at 10; Def.'s Statement of Material Facts (Doc. 30) at 1–2.  *See also* Schulz Aff. (Doc 28-1) at 3.  Medical school is typically completed in four years, but Dr. Stepps received his medical degree after his fifth year of medical school at UAMS.  *See* Stepps Dep. (Doc. 33-1) at 8.

Like nearly all medical schools, UAMS participates in the National Resident Matching Program (NRMP), commonly referred to as "the Match."[15]  The matching process occurs during a student's fourth year of medical school.[16]  The Match uses a mathematical algorithm to match the preferences of medical students who apply to residency positions across the United States with the preferences of the respective residency programs.[17]

To participate in the Match, applicants must apply to residency programs through an online platform beginning in September of their fourth year of medical school.[18]  After students interview with the residency programs, the students rank those programs in preference order.[19]  The residency programs, in turn, rank the student applicants in preference order.[20]  NRMP then runs its matching algorithm, and in March, the applicants and the residency programs receive their Match results.[21]  The Match algorithm is applicant-centric; it is designed to pair an individual applicant with the interested program that he or she most prefers.[22]  Although the Match process is considered "extremely student friendly," not everyone "matches."[23]  Some students are not competitive enough to match with any of the residency programs to which they apply.

---

[15] *See* Def.'s Statement of Material Facts (Doc. 30) at 2.

[16] *See id.*

[17] *See id.* at 2–3.

[18] *See* Stepps Dep. (Doc. 33-1) at 12.

[19] *See* Def.'s Statement of Material Facts (Doc. 30) at 3.

[20] *See id.*

[21] *See* Schulz Dep. (Doc. 33-2) at 13; Stepps Dep. (Doc. 33-1) at 12.

[22] *See* Def.'s Statement of Material Facts (Doc. 30) at 3. *See also* Schulz Dep. (Doc. 33-2) at 13 ("[Y]ou may get your third choice; you may get your fourth choice.  But everything in the computer program aligns the wants of the student and then the rank order list of the program, and then they end up being matched to a particular program . . . for that time.").

[23] *See* Def.'s Statement of Material Facts (Doc. 30) at 3. *See also* Schulz Dep. (Doc. 33-2) at 13 ("[The Match] is extremely student friendly, meaning that you're not going to go somewhere you don't want to go.").

Dr. Stepps appears to have been such a student.  Recall that it took Dr. Stepps three attempts to pass both the Step 1 exam and the Step 2 exam.  During his first round of residency applications, Dr. Stepps did not yet have a passing Step 2 exam score.[24]  As Dr. Stepps knew at the time, UAMS leadership had expressed concerns about his ability to match without a passing score on the Step 2 exam.[25]  During his first time through the Match process, Dr. Stepps interviewed with seven or eight programs in Arkansas.[26]  But Dr. Stepps did not match to a residency program.[27]

In January 2016, Dr. Stepps finally received a passing Step 2 score.[28]  So, after graduating from medical school, Dr. Stepps once again entered the Match and reapplied to residency programs.[29]  This time, Dr. Stepps applied to a new UAMS Internal Medicine Residency Program recently established in northwest Arkansas (as well as several other residency programs in Arkansas).[30]  UAMS faculty had been concerned that Dr. Stepps would again fail to match to any residency program.[31]  So, unbeknownst to Dr. Stepps, they personally contacted Dr. Thomas Schulz, the Program Director of the new Internal Medicine Residency Program in northwest Arkansas.[32]  They advocated for Dr. Stepps's consideration as a candidate to the fledgling

---

[24] *See* Stepps Dep. (Doc. 33-1) at 13.

[25] *See id.* at 16.

[26] *See id.* at 13.

[27] *See id.* ("I didn't match that time . . . of course[,] because I didn't have my [S]tep 2 score.").

[28] *See id.* at 12.

[29] *See id.* at 13.

[30] *See* Def.'s Statement of Material Facts (Doc. 30) at 3.

[31] *See* Nov. 4, 2023 Summ. J. Hr'g Tr. (Rough) at 10; Def.'s Statement of Material Facts (Doc. 30) at 2.

[32] *See* Nov. 4, 2023 Summ. J. Hr'g Tr. (Rough) at 10.  For example, the Associate Dean of the medical school, Dr. Sara Tariq, spoke with Dr. Schulz and encouraged him to give Dr. Stepps a chance.  *See* Def.'s Statement of Material Facts (Doc. 30) at 2.

program.[33]  They explicitly expressed to Dr. Schulz that they were concerned that Dr. Stepps would not match to a residency program.[34]

Dr. Schulz interviewed Dr. Stepps for the new Internal Medicine Residency Program.[35]  At the time of the interview, Dr. Schulz had already spoken to UAMS faculty, and he was aware that Dr. Stepps had struggled to pass his Step 1 and Step 2 exams.[36]  During this round of the Match, Dr. Stepps interviewed with a total of four programs.[37]  He ranked the new UAMS Internal Medicine Residency Program as his top choice.[38]  And he successfully matched to the program.[39]

## II.    An Overview of the Internal Medicine Residency Program

The UAMS Internal Medicine Residency Program admitted eight students into its first class.[40]  Dr. Stepps was the only African-American resident in the class.[41]  The residents began their first year of residency on July 1, 2016.[42]  The first year of the program was designed to

---

[33] *See* Schulz Dep. (Doc. 33-2) at 107.  This was the first time that Dr. Schulz learned about Dr. Stepps and his academic struggles.  *See id.* at 107–08.  The faculty members "discussed [with Dr. Schulz] that [Dr. Stepps] had some difficulty in medical school . . . [and] had had some bumps along the way[,] but was going to successfully complete medical school."  *Id.* at 108.

[34] *See id.* at 108 ("At that point, [Dr. Stepps] had not received any interviews for . . . residency in the [M]atch, and [the UAMS faculty] were concerned that he would go unmatched.").  Dr. Stepps does not recall any UAMS faculty mentioning to him that they were reaching out to programs to advocate for the consideration of his candidacy.  Nor did he recall anyone expressing concern about his ability to match during his second time through the Match process.  *See* Stepps Dep. (Doc. 33-1) at 16.

[35] *See* Schulz Dep. (Doc. 33-2) at 111; Stepps Dep. (Doc. 33-1) at 18.

[36] *See* Schulz Dep. (Doc. 33-2) at 111.

[37] *See* Stepps Dep. (Doc. 33-1) at 14.

[38] *See* Def.'s Statement of Material Facts (Doc. 30) at 3; *see also* Stepps Dep. (Doc. 33-1) at 15.

[39] *See* Def.'s Statement of Material Facts (Doc. 30) at 3; *see also* Stepps Dep. (Doc. 33-1) at 15.  The program similarly ranked Dr. Stepps as one of the eight applicants it wanted in its first residency class.  *See* Def.'s Statement of Material Facts (Doc. 30) at 3.  Dr. Schulz served as the Program Director of the Internal Medicine Residency Program throughout Dr. Stepps's time in the program.  *See* Schulz Dep. (Doc. 33-2) at 10.

[40] *See* Schulz Dep. (Doc. 33-2) at 15.

[41] *See id.*; Stepps Dep. (Doc. 33-1) at 18.  There were four Asian residents, and three white residents.  *See* Schulz Dep. (Doc. 33-2) at 96, 126.  *See also* Def.'s Statement of Material Facts (Doc. 30) at 3.  The class was comprised of three female residents, and five male residents.  *See* Schulz Dep. (Doc. 33-2) at 126.

[42] *See* Stepps Dep. (Doc. 33-1) at 16; Def.'s Statement of Material Facts (Doc. 30) at 3–4.  Dr. Stepps had visited northwest Arkansas in March or April 2016 to apartment hunt prior to the beginning of residency.  *See* Stepps Dep.

provide the residents with an understanding of the basic components of internal medicine.[43]   The program introduced the residents to inpatient service for the first four-to-six months of their first year.[44]   During the remainder of the year, the residents were placed on rotations across intensive care (ICU), general medicine, the emergency department, all internal medicine subspecialties, and the program's outpatient clinic.[45]   The program had a clinical site at Mercy Hospital in Rogers, Arkansas, where the residents were assigned to treat individual patients.[46]

Each resident's performance during his or her assigned rotations and clinical duties was evaluated against specific milestone standards established by the Accreditation Council for Graduate Medical Education (ACGME).[47]   During each rotation, UAMS faculty members—the residents' supervising physicians—completed written evaluations of each resident based on the ACGME milestones.[48]   The supervising physicians entered these standardized evaluations into the New Innovations computer system.[49]   All residents, including Dr. Stepps, had open access to the New Innovations system to review their respective evaluations.[50]   The residents, in turn, were

---

(Doc. 33-1) at 20.  Before he started residency, Dr. Schulz invited Dr. Stepps to attend a Razorbacks basketball game.  *See id.* at 21.  It was just the two of them who attended the basketball game.  *Id.* at 22.

[43] *See* Schulz Dep. (Doc. 33-2) at 112.  Broadly speaking, a residency program is "a structured educational activity comprising a series of clinical and/or other learning experiences in graduate medical education, designed to prepare physicians to enter the unsupervised practice of medicine in a primary specialty."  Def.'s Statement of Material Facts (Doc. 30) at 4 (citing the ACGME Glossary of Terms) (quotation marks omitted).

[44] *See* Def.'s Statement of Material Facts (Doc. 30) at 4.

[45] *See id.* at 4; Schulz Aff. (Doc 28-1) at 2; Schulz Dep. (Doc. 33-2) at 112; Stepps Dep. (Doc. 33-1) at 17.

[46] *See* Schulz Aff. (Doc 28-1) at 2.

[47] *See* Def.'s Statement of Material Facts (Doc. 30) at 4.

[48] *See id.*; *see also* Schulz Dep. (Doc. 33-2) at 112–13.

[49] *See* Def.'s Statement of Material Facts (Doc. 30) at 4; Schulz Aff. (Doc 28-1) at 2.

[50] *See* Def.'s Statement of Material Facts (Doc. 30) at 5; Schulz Dep. (Doc. 33-2) at 131; Stepps Dep. (Doc. 33-1) at 41.  The residents were notified at orientation, and reminded throughout the first year, that they could access their evaluations by logging into the New Innovations system.  *See* Schulz Dep. (Doc. 33-2) at 131.  Dr. Stepps recalled that the residents "would get a notification from [their] [Residency] [C]oordinator, Wyvonne [Ora], that evaluations had been completed, and then [the residents] would go online and view [their respective] evaluation."  *See* Stepps Dep. (Doc. 33-1) at 38.

expected to digitally evaluate their supervising faculty on a monthly basis.[51]   Residents also received an objective semi-annual written evaluation from their supervising physicians.[52]   If a resident consistently underperformed, the ACGME requirements set forth parameters for remediation, probation, and, in some cases, termination.[53]

To maintain ACGME accreditation, medical residency programs are required to have a Clinical Competency Committee that evaluates residents against the ACGME milestones and makes decisions regarding resident progress, remediation, and discipline.[54]   At the UAMS Internal Medicine Residency Program in northwest Arkansas, the Committee was comprised of core faculty members of the residency program.[55]   Dr. Schulz, as the Program Director, was also part of the Committee.[56]   The Committee periodically directed Dr. Schulz to implement remediation steps after the Committee had reviewed and discussed the progress of each resident in the program.[57]

As a general matter, if a resident missed an ACGME milestone, UAMS policy provided for remediation measures via a performance improvement plan (PIP).[58]   Based upon the ACGME milestones, PIPs were implemented as a remediation tool designed to assist a resident who struggled in a certain area(s) to focus his or her attention on the area(s) of needed improvement

---

[51] *See* Schulz Dep. (Doc. 33-2) at 113.

[52] *See id.* at 20.

[53] *See id*.

[54] *See* Def.'s Statement of Material Facts (Doc. 30) at 5–6.

[55] *See id.*

[56] *See* Schulz Dep. (Doc. 33-2) at 28; Schulz Aff. (Doc. 28-1) at 3.

[57] *See* Def.'s Statement of Material Facts (Doc. 30) at 6.  *See also* Schulz Aff. (Doc. 28-1) at 3 ("The [P]rogram [D]irector is not the chair of the [Committee], and the [Committee] is a mechanism to provide checks and balances on the [P]rogram [D]irector to keep him or her from pursuing his or her own agenda or personal bias.  Decisions on resident progress and remediation are accomplished by consensus of the Committee.").

[58] *See* Schulz Dep. (Doc. 33-2) at 20–21.

8

and to sufficiently meet the ACGME milestone(s) that were not being met.[59]  The Committee held ultimate authority over whether or not to place a resident on a PIP or take other remediation measures.[60]

### III.   Dr. Stepps's First Year of Residency

Initially, Dr. Stepps performed at an expected level for a first-year resident.[61]  But in February 2017—about seven months into his first year of residency—the story changed in two ways.  First, Dr. Stepps's supervising physicians noted that he struggled with presenting complete information on his patients and that he appeared to be unprepared during his rounds.[62]  Second, Dr. Stepps began to feel like he was being treated differently from the other residents by one of his supervising physicians, Dr. Chris Clark.[63]

On one occasion in February 2017, while Dr. Stepps was presenting on a patient, Dr. Clark asked Dr. Stepps if he had reviewed the patient's CT scan.[64]  Dr. Stepps replied that he had not and apologized.[65]  Dr. Clark then said, "[Y]ou're supposed to know that.  Why didn't you do that?"[66]  Dr. Stepps apologized profusely and said that he would remember the CT scan next time.[67]  Dr. Stepps did not recall an occasion where Dr. Clark had publicly singled out another resident for

---

[59] *See* Def.'s Statement of Material Facts (Doc. 30) at 5; Schulz Dep. (Doc. 33-2) at 21.

[60] *See* Def.'s Statement of Material Facts (Doc. 30) at 6.

[61] *See id.* at 5.

[62] *See id.*

[63] *See* Stepps Dep. (Doc. 33-1) at 25–26.  Dr. Clark supervised Dr. Stepps approximately every other week for twelve weeks.  *Id.* at 26–27.  Besides Dr. Clark, Dr. Stepps did not recall having issues of this nature with any of the other supervising physicians.  *See id.* at 25.

[64] *See id.* at 28.

[65] *See id*.

[66] *See id*.  Dr. Stepps characterized this encounter as Dr. Clark "stopp[ing] to make a scene" in front of the other residents and nurses.  *See id.*

[67] *See id*.

being unprepared in that fashion.[68]   And, indeed, what happened next heightened Dr. Stepps's feeling of differential treatment.[69]

Before seeing the next patient, Dr. Clark requested the patient's echocardiogram report from another resident, but that resident had forgotten the report.[70]   Dr. Clark folded up his patient chart and said, "That's okay.   Come on.   Let's go see the patient."[71]   Dr. Stepps became visibly upset because he felt like his mistake was treated differently than the other resident's mistake, so he asked to speak with Dr. Clark in private.[72]   During this private conversation, Dr. Clark compared Dr. Stepps to another resident and explained that he believed the other resident was better than Dr. Stepps.[73]   Dr. Clark then expressed frustration with Dr. Stepps for his lack of improvement.[74] And Dr. Clark explained that he had stayed up late, working for multiple hours, to fix errors made by Dr. Stepps.[75]   This statement confused Dr. Stepps, because he did not know to what errors Dr. Clark was referring.[76]

---

[68] *See id.* at 29 ("So he has . . . reprimanded residents . . . if you forget a certain lab value or something, but not to the point of creating a scene of, you know, hey, I'm frustrated.   You know, kind of giving off this tone of, why don't you have this?").   There were two other residents present during this encounter, along with several nurses.   *See id.* at 30. This encounter happened outside of the patient's door.   *See id.* at 28.

[69] *See id.* at 28.

[70] *See id.*

[71] *See id.*

[72] *See id.* ("So, at that time, I became visibly upset.   I'm, like, okay, wait a minute.   Like, this is clear.   This is obvious. Like, hey, there's something going on here.   And so I did ask to speak with Dr. Clark in private.").

[73] *See id.* at 27–28.   *See also id.* at 29 (clarifying that the comparison was made during the private conversation, and not in front of the other residents).

[74] *See id.* at 28.

[75] *See id.* at 28, 40.

[76] *See id.* 28 ("Again, confused, because I didn't understand what errors he was speaking on.").   *See also id.* at 39–40 ("[T]here was never a sit-down evaluation period, which was supposed to be technically what we call a mid[term] evaluation . . . I didn't know we were supposed to get mid-[term] evaluations until after my altercation with Dr. Clark. Because I was confused as to, again, where is all this frustration coming from, you know?   And what mistakes are you having to stay till 10:00 o'clock at night to fix?   I had no idea.").

Dr. Clark saw that Dr. Stepps was visibly upset and suggested that it would be best to have a third party present for the remainder of the conversation.[77] So Dr. Stepps spoke with a Mercy Hospital representative, who escalated the matter to Dr. Schulz.[78] Dr. Schulz advised that Dr. Stepps should go home and relax, and that they would address the matter the next morning.[79] Dr. Schulz then sent a follow-up email to Dr. Stepps to schedule a meeting to discuss the matter further.[80]

A couple of days later, Dr. Stepps met with Dr. Schulz and the UAMS Residency Coordinator, Wyvonne Ora.[81] During the meeting, Dr. Schulz listened to Dr. Stepps's concerns about being singled out by Dr. Clark and how that made him feel.[82] After listening to Dr. Stepps describe feelings of stress and anxiety, Dr. Schulz inquired about Dr. Stepps's mental health.[83] Dr. Stepps explained that, as the only African-American resident in his class, he felt isolated because he didn't have a trusted person that he could open up to, and that he was "just trying to . . . acclimate to residency."[84] To address these concerns, Dr. Schulz mentioned the option that Dr. Stepps could participate in an Employee Assistance Program (EAP).[85] Dr. Stepps thought that this was an appropriate recommendation.[86]

---

[77] *See id.* at 33–34.

[78] *See id.* at 33.

[79] *See id.*

[80] *See id.* at 35 (Dr. Stepps recalling that the meeting was scheduled "relatively quick," and scheduled for less than a week after the phone conversation, but not recalling the specific date).

[81] *See id.* (explaining that Ms. Ora was "always present" during this meeting).

[82] *See id.*

[83] *See id.* at 36.

[84] *See id.*

[85] *See id.*

[86] *See id.*

Dr. Stepps sought services from the EAP, and attended all ten sessions that he was offered.[87]  During these sessions, Dr. Stepps met with therapist Valerie McDermott.[88]  Dr. Stepps felt that these sessions were a safe place for him to express himself and to discuss things that he observed throughout the day.[89]  He expressed to Ms. McDermott that Dr. Clark made him feel anxious, and that he felt like Dr. Clark was "using this atmosphere as a place of humiliation."[90]  Dr. Stepps did not feel like any other supervising physician harshly criticized him like Dr. Clark did.[91]  Despite feeling less confident around Dr. Clark, Dr. Stepps continued his assigned rotations with Dr. Clark without further incident.[92]

Between late February and early March 2017, Dr. Stepps took a brief medical leave.[93]  It is not exactly clear whether the EAP sessions occurred before, during, or after this leave.  Neither Dr. Schulz nor any of the other program administrators knew the reasons for Dr. Stepps's medical leave.[94]  But Dr. Stepps communicated that he felt it was necessary for his well-being, so Dr. Schulz approved it.[95]  And, again, the leave was very brief.

---

[87] *See id.* at 37.

[88] *See id.*

[89] *See id.*

[90] *See id.*

[91] *See id.* at 55.

[92] *See id.* at 37–38, 56.  Besides recommending the EAP counseling sessions, there was no other specific course of action taken after the meeting regarding Dr. Stepps's concerns.  *See id.* at 36 ("So there was no . . . specific plan of action.  I remember, again, Dr. Clark was leaving the service, so there was time to blow over between us working directly with one another.  I'll be honest, I can't recall the exact details . . . basically, I remember Dr. Schulz just kind of assessing . . . what's going on.  Was there something going on with me, is there something . . . what's going on with Dr. Clark.").

[93] *See* Def.'s Statement of Material Facts (Doc. 30) at 5.

[94] *See id.*

[95] *See id.*

During subsequent rotations with Dr. Clark, Dr. Stepps believed that he received less oral feedback than the other residents, who he felt were given meaningful, qualitative assessments.[96] Dr. Stepps could not recall receiving comments from Dr. Clark about specific areas where he could improve his performance.[97]   Dr. Stepps also believed the subsequent rotations showed how differently he was treated by Dr. Clark.  In Dr. Stepps's mind, these rotations confirmed that he was not alone in his errors.[98]  According to him, the residents in his class were all interns and "were all making mistakes."[99]   And when Dr. Stepps made the mistake during the February 2017 incident, he described how the situation "turn[ed] into this uproar, like this frustration" on the part of Dr. Clark.[100]   But, from Dr. Stepps's perspective, when the other residents made a mistake, Dr. Clark would treat them with a more reassuring and reaffirming tone.[101]

---

[96] *See* Stepps Dep. (Doc. 33-1) at 41–43.

[97] *See id.* at 41.  The February 2017 encounter between Dr. Stepps and Dr. Clark cuts (at least a little) against Dr. Stepps's reasoning here.  Based upon Dr. Stepps's own recollection of the encounter, Dr. Clark made it clear that Dr. Stepps was expected to be prepared with the patient's CT scan and Dr. Stepps understood and acknowledged that he needed to be prepared with the CT scan during future patient presentations.  Thus, from this encounter, a reasonable jury would conclude that Dr. Clark did indeed (on at least one occasion) communicate to Dr. Stepps what was expected from him and where he fell below expectations.  But besides this singular event, the record is devoid of evidence as to the type, quality, and frequency of the feedback that Dr. Clark provided to the other residents.

[98] *See id.* at 42.

[99] *See id.*

[100] *See id.*

[101] *See id.*  In his deposition testimony, Dr. Stepps expressly stated that he did not have another direct significant clash with Dr. Clark following the February 2017 encounter.  *See id.* at 37–38 (explaining that, although Dr. Stepps had other rotations under Dr. Clark's supervision, there were no more incidents between the two men following the February 2017 encounter); *see also id.* at 56 ("[N]o, there were no other incidents.").  This is in some tension with the general and sweeping language Dr. Stepps sometimes uses to describe his working relationship with Dr. Clark.  But that general and sweeping language must give way to Dr. Stepps's explicit testimony that Dr. Stepps had a single verbal altercation with Dr. Clark in February 2017.  The most pro-Plaintiff version of this evidence that could be accepted by a reasonable jury is that Dr. Stepps's more universal statements about feeling singled out if he made a mistake were referring to the ongoing psychological toll of the singular encounter with Dr. Clark.  For example, Dr. Stepps characterized the February 2017 encounter as "the tip of the iceberg."  *See id.* at 55.  However, when Dr. Stepps made this characterization, he described the conflict of his working relationship with Dr. Clark as "building up" until that moment.  *See id.* at 55–56.  Further, Dr. Stepps believed that his conflict with Dr. Clark "started day one [of] working with him."  *See id.* at 55.  Thus, rather than characterizing February 2017 as just a small part as a bigger situation (i.e., tip of the iceberg), the Court understands Dr. Stepps to have meant that the February 2017 confrontation between Dr. Stepps and Dr. Clark over a patient's CT scan was the idiomatic breaking point in their professional

Dr. Stepps also mentioned being undermined by Dr. Clark—and by another white attending physician, Dr. Robert Sanders—when they made changes to Dr. Stepps's patient treatment plan without consulting him.[102]  This frustrated Dr. Stepps, because without meaningful feedback, he did not know how to improve his performance.[103]  Dr. Stepps explained that attending physicians generally provided him with a courtesy text message or private conversation before patient rounds to alert him that they had canceled something that he had ordered or that they had made a change to his treatment plan.[104]  In contrast, Dr. Stepps felt like Dr. Clark intentionally humiliated Dr. Stepps by letting him present on a patient and describe his treatment plan only for Dr. Clark to then dismissively say, "We're not doing any of that."[105]

In any event, in March 2017, the Committee determined that Dr. Stepps was deficient in four ACGME milestones and placed him on a three-month PIP to remediate those deficient milestones.[106]  Dr. Stepps received an email from Dr. Schulz explaining the Committee's concerns

---

[102] *See id.* at 48–50.  Dr. Stepps estimated that these changes occurred at least weekly with Dr. Clark, and on just a few occasions with Dr. Sanders.  *See id.* at 50.

[103] *See id.* at 51–52 ("I don't think—I don't know if it was intentional.  I think [Dr. Sanders] saw an error and—I guess, a perceived error and he wanted to fix it.  But the frustrating part . . . is I wanted to improve as a physician, so I need to know when mistakes are happening.  You know, you fix the mistake but then complain about me making mistakes, but none of this is brought to me.  I can't fix that.  So I want to know when mistakes are happening, point them out, you know.").  Dr. Stepps clarified that this only occurred once with Dr. Sanders and was cleared up after a conversation.  *See id.* at 54.  Besides Dr. Clark and Dr. Sanders, Dr. Stepps did not experience this issue with any of the other attending physicians.  *See id.*

[104] *See id.* at 53.  ("Traditionally, the attending would let us know, whether it was through a text message or even before rounds, like, 'Hey Dr. Stepps, I saw, you know, you were putting a chest x-ray in on Patient 607.  Hey, I went ahead and canceled that because we're going to go ahead and discharge the patient.'  And it's like, 'Oh okay.  Cool.'  You know, so we had this conversation, and we communicated about the plan.").

[105] *See id.* at 53–54.  Dr. Clark was not the only faculty member recording negative evaluation notes of Dr. Stepps's performance.  *See* Schulz Dep. (Doc. 33-2) at 113; *see also* Nov. 4, 2023 Summ. J. Hr'g Tr. (Rough) at 11.  For example, other supervising faculty reported that Dr. Stepps struggled in presenting during rounds and appeared unprepared.  *See* Def.'s Statement of Material Facts (Doc. 30) at 5; Nov. 4, 2023 Summ. J. Hr'g Tr. (Rough) at 11.

[106] *See* Def.'s Statement of Material Facts (Doc. 30) at 6; Schulz Dep. (Doc. 33-2) at 88.

14

about Dr. Stepps's poor performance and lack of preparedness for additional responsibility.[107]  To successfully complete the PIP, Dr. Stepps had to: (1) develop and achieve a comprehensive management plan for each of his patients; (2) manage his patients with progressive responsibility and independence; (3) increase his clinical knowledge; and (4) accept responsibility and follow through on tasks.[108]  Dr. Stepps was required to demonstrate competency in these four areas to be promoted to the next level of residency.[109]  As part of the PIP, Dr. Stepps was assigned to a one-month rotation at Mercy Hospital to get more inpatient experience.[110]

In addition to receiving weekly feedback from his attending physicians, Dr. Stepps met with Dr. Schulz weekly during the PIP to review his deficiencies and to discuss areas where he had improved.[111]  Despite expressing initial frustration with being placed on the PIP, Dr. Stepps embraced the experience and he worked to improve his performance.[112]  He successfully completed the PIP with an overall "satisfactory" rating.[113]  On June 30, 2017, Dr. Stepps completed his Post Graduate Year One (PGY1) in the UAMS Internal Medicine Residency Program and was promoted to Post Graduate Year Two (PGY2).[114]  In normal speak, that means he went from being a first-year resident to a second-year resident.

---

[107] See Stepps Dep. (Doc. 33-1) at 66.

[108] See Def.'s Statement of Material Facts (Doc. 30) at 6.

[109] See id.

[110] See Stepps Dep. (Doc. 33-1) at 66.

[111] See id.

[112] See id.

[113] See Def.'s Statement of Material Facts (Doc. 30) at 5; see also Schulz Dep. (Doc. 33-2) at 86, 132.

[114] See Schulz Dep. (Doc. 33-2) at 85–86.

## IV.    Dr. Stepps's Second Year of Residency

Dr. Stepps began as a PGY2 on July 1, 2017.[115]  Shortly after his promotion from PGY1 to PGY2, supervising faculty members grew concerned that Dr. Stepps's medical knowledge, self-reflection skills, and managerial abilities were inadequate to successfully cope with the demands of the PGY2 year.[116]  Specifically, they believed that Dr. Stepps struggled with his ability to: (1) make appropriate medical diagnoses, (2) order proper therapeutic interventions, (3) make decisions about how to facilitate patient hospital discharge, and (4) work as part of a team with attending senior residents, junior residents, and medical students.[117]

About ten days into Dr. Stepps's ICU rotation, his attending physician, Dr. Jason McKinney, informed Dr. Stepps that he was "performing way below expectations[,]" and provided Dr. Stepps with "very specific examples."[118]  Dr. McKinney's evaluation of Dr. Stepps in the New Innovations system indicated that, in nine out of thirty-three areas, Dr. Stepps "[could not] perform th[e] skill even with assistance."[119]  In fifteen areas, Dr. McKinney rated Dr. Stepps as "Resident can perform this skill under close direct supervision . . . ."[120]  Dr. McKinney reported concerns about Dr. Stepps's performance to Brad Seusy (the Mercy Hospital liaison to the Internal Medicine Residency Program), who forwarded the email to Dr. Schulz.[121]  The email documented Dr. McKinney's concerns that Dr. Stepps's presentations on patients during his ICU rotation were

---

[115] *See* Def.'s Statement of Material Facts (Doc. 30) at 5.  *See also* Schulz Dep. (Doc. 33-2) at 132; Stepps Dep. (Doc. 33-1) at 75.

[116] *See* Schulz Dep. (Doc. 33-2) at 86–87 (testifying about conclusions drawn by the supervising faculty regarding Dr. Stepps's performance issues).

[117] *See id.* at 87.  Managing a team of assigned medical student interns is the responsibility of a PGY2 resident.  *See id.*

[118] *See* Def.'s Statement of Material Facts (Doc. 30) at 7.

[119] *See id.* (quoting Attachment D, New Innovations Evaluation by Dr. McKinney).

[120] *See id.*

[121] *See id.* at 6.

poorly structured and unfocused, that Dr. Stepps continued to place orders incorrectly, and that Dr. Stepps's overall "fund of knowledge [was] so very poor."[122]

On July 19, 2017, Mr. Seusy forwarded an email to Dr. Schulz that represented the "collective opinion" of three Mercy Hospital ICU physicians (including Dr. McKinney), and described specific concerns about Dr. Stepps.[123]  These doctors opined that Dr. Stepps was failing his ICU rotation at the halfway point, and they were concerned that "[h]is fund of very basic medical knowledge [was] very deficient and overall he [was] not ready to function as a PGY2[,]" that he did the bare minimum of what was asked of him, and that he appeared unfocused during his rounds.[124]  They rated Dr. Stepps's performance at the level of a fourth-year medical student as opposed to a second-year resident.[125]  They recommended that Dr. Stepps be required to repeat two-to-three months on the wards at Mercy Hospital as a PGY1; if he performed that function satisfactorily, he could return to the ICU rotation as a PGY1 on a trial basis, and then they would determine if he was ready to again act as a PGY2.[126]

Given the concerns from the ICU attending physicians at Mercy Hospital, Dr. Schulz met with members of Mercy Hospital administration who relayed that the ICU nursing staff were also "very concerned about [Dr. Stepps] being dangerous" because they had caught several errors in orders he had entered.[127]  Dr. Schulz and core-faculty member Dr. Drake Rippelmeyer met with

---

[122] *See id.* at 7 (quoting Attachment C, Emails from Brad Seusy to Dr. Schulz).

[123] *See id.*  Dr. McKinney authored the email and cc'd Dr. Penchala Mittadodla and Dr. Amer Raza on the email.  *See id; see also* July 19, 2017 Email from Dr. Jason McKinney to Mr. Brad Seusy Ex. 4 to Schulz Aff. (Doc. 28-1) at 15

[124] *See* July 19, 2017 Email from Dr. Jason McKinney to Mr. Brad Seusy Ex. 4 to Schulz Aff. (Doc. 28-1) at 15.

[125] *See* Schulz Dep. (Doc. 33-2) at 47.

[126] *See* Def.'s Statement of Material Facts (Doc. 30) at 7.

[127] *See id.* at 8 (quoting the emails and evaluation from Dr. McKinney) (internal quotation marks omitted).

Dr. Stepps to discuss the concerns raised by the Mercy Hospital staff and physicians.[128]  Dr. Schulz notified Dr. Stepps of the deficiencies raised by Dr. McKinney and advised him that the Committee would convene on an emergency basis to determine how to proceed.[129]  Dr. Stepps was removed from the ICU rotation until the Committee could meet.[130]  And Dr. Schulz reported to the ACGME that Dr. Stepps was not meeting the standardized milestone requirements.[131]

On August 4, 2017, Dr. Schulz met with Dr. Stepps to notify him of the Committee's unanimous decision to place Dr. Stepps on another PIP.[132]  This three-month PIP required that Dr. Stepps successfully master twelve skills across ten ACGME milestones to continue as a PGY2.[133]  The PIP explained each deficit and the level of improvement required to clear the milestones.[134]  During this meeting, Dr. Stepps was advised that his failure to master these skills could lead to additional remediation or probation.[135]  The PIP also required Dr. Stepps to improve his score on another required exam: the Internal Medicine In-Training Examination (IM-ITE).[136]  At that point, his score was in the 3rd percentile, and the PIP required him to improve his score to at least the 20th percentile.[137]  Ultimately, a score in the 30th percentile is necessary to pass the

---

[128] *See id.*

[129] *See id.*  Dr. Schulz also explained that he would meet with Dr. Stepps after the meeting to discuss the recommendations.  *See id.*

[130] *See id.*

[131] *See* Schulz Dep. (Doc. 33-2) at 43.

[132] *See* Def.'s Statement of Material Facts (Doc. 30) at 8.

[133] *See id.*

[134] *See id.* at 8–9.  The milestones included: medical knowledge, professionalism, patient care, interpersonal communication skills, systems-based practice, and practice-based learning.  *See id.*

[135] *See id.* at 9.

[136] *See id.*

[137] *See id.*; *see also* Schulz Dep. (Doc. 33-1) at 76.

American Board of Internal Medicine certification exam, so that a doctor can achieve board-certification.[138]

Dr. Stepps signed the PIP, acknowledging that he received the plan.[139]  Dr. Schulz informed Dr. Stepps that he could appeal the PIP through the UAMS academic appeal process.[140] But Dr. Stepps did not appeal the Committee's decision to place him on the PIP.[141]  In addition to holding the mandatory weekly PIP meetings to discuss his progress, Dr. Schulz referred Dr. Stepps to Dr. Jasna Vuk, an educational specialist.[142]  Dr. Stepps had previously worked with Dr. Vuk during medical school.[143]  Dr. Stepps met with Dr. Vuk to improve his study methods and test-taking mechanics as he prepared for the Step 3 exam.[144]

On October 9, 2017, Dr. Stepps sent a letter to Dr. Schulz in his official capacity as the Program Director.[145]  In the letter, Dr. Stepps alleged that Dr. Clark subjected him to disparate treatment, humiliation, anxiety, and stress.[146]  Dr. Stepps expressed that he felt that Dr. Clark was

---

[138] *See* Def.'s Statement of Material Facts (Doc. 30) at 9.  Residents are required to take an in-training exam every year administered by the American College of Physicians. *See* Schulz Dep. (Doc. 33-2) at 75–76.  Dr. Stepps scored in the 3rd percentile on his IM-ITE exam. *See id.* at 76.  To be able to pass the American Board of Internal Medicine certification exam—i.e., to achieve board certification at the end of residency, a doctor needs to score in the 30th percentile to pass. *See id.*  A score in the 3rd percentile is indicative of significant knowledge gaps. *See id.*

[139] *See* Schulz Dep. (Doc. 33-2) at 89.

[140] *See id*; *see also* Aug. 4, 2017 Signed Performance Improvement Plan Ex. 7 to Schulz Aff. (Doc. 28-1) at 25 ("This is an academic decision and the UAMS College of Medicine (COM) has Graduate Medical Education (GME) policies that cover both due process and the academic appeal process.  I will send you an email with links to these UAMS policies, as well as providing you with a paper copy.").

[141] *See* Nov. 4, 2023 Summ. J. Hr'g Tr. (Rough) at 12.

[142] *See* Schulz Dep. (Doc. 33-2) at 77.

[143] *See id.*

[144] *See id*.

[145] *See* Oct. 9, 2017 Letter from Dr. Kristopher Stepps to Dr. Thomas Schulz Attach. F to Schulz Aff. (Doc. 28-1) at 34–39.  *See also* Stepps Dep. (Doc. 33-1) at 57–58; Def.'s Statement of Material Facts (Doc. 30) at 12.

[146] *See* Oct. 9, 2017 Letter from Dr. Kristopher Stepps to Dr. Thomas Schulz Attach. F to Schulz Aff. (Doc. 28-1) at 34–39; *see also* Bradley Aff. Ex. 7 to Def.'s Mot. for Summ. J. (Doc. 28-7) at 1; Def.'s Statement of Material Facts (Doc. 30) at 12.

humiliating him in group settings and "that Dr. Clark [was] no longer using his platform as a teaching one, but rather one to embarrass [Dr. Stepps] for making a mistake that [was] non critical in nature."[147]  The letter continued in a similar vein:

> Dr. Clark has caused me humiliation, anxiety, and stress, in an already stressful environment.  He does not give me the same feedback that he gives to other residents and continues to report things to you about my performance without reviewing them with me.  The only conclusion that I can come to is that Dr. Clark is singling me out due to some unconscious bias.  Again, I do not want to pursue this as a cause of action, [a]ll I want is to be treated fairly and equally, and to be allowed to complete my residency program with the same support and direction as the other residents.[148]

Dr. Schulz referred the complaint to Audrey Bradley, Senior Director of UAMS Employee Relations.[149]  Ms. Bradley was "responsible for policy and procedure compliance, investigating complaints and grievances, and ensuring [UAMS's] compliance with . . . Title VII and Title IX."[150]  Dr. Schulz relayed to Ms. Bradley that Dr. Stepps had alleged that Dr. Clark treated Dr. Stepps differently from other residents, and that Dr. Stepps believed these actions were discriminatory.[151]

At Dr. Schulz's suggestion, Dr. Stepps wrote a letter to Ms. Bradley detailing the alleged discrimination.[152]  Ms. Bradley investigated the matter by: (1) interviewing Dr. Stepps three times, (2) reviewing the October 9, 2017 letter from Dr. Stepps to Dr. Schulz, (3) reviewing records provided by Dr. Schulz, and (4) reviewing a response to the allegations that Dr. Clark had

---

[147] *See* Oct. 9, 2017 Letter from Dr. Kristopher Stepps to Dr. Thomas Schulz Attach. F to Schulz Aff. (Doc. 28-1) at 38.

[148] *See id.* at 39.

[149] *See* Def.'s Statement of Material Facts (Doc. 30) at 12; *see also* Bradley Aff. Ex. 7 to Def.'s Mot. for Summ. J. (Doc. 28-7) at 1.

[150] Bradley Aff. Ex. 7 to Def.'s Mot. for Summ. J. (Doc. 28-7) at 1.

[151] *See id.*

[152] *See* Stepps Dep. (Doc. 33-1) at 57–58.

prepared.[153]  Ms. Bradley could not substantiate the allegations of discrimination, and she relayed this finding to Dr. Stepps in an email.[154]  Dr. Stepps received this notification from Ms. Bradley about two weeks after he had first reached out to her.[155]  Ms. Bradley noted that, at the time, Dr. Stepps told her that he had no witnesses and that he "had no interest in turning this into anything."[156]

On September 22, 2017, Dr. Clark learned that Dr. Stepps had neglected to see a patient for several days.[157]  A fourth-year medical student, Mikaila Calcagni, was also assigned to this patient.[158]  Earlier that day, before Dr. Clark made this discovery, Dr. Stepps told Ms. Calcagni that he would not be seeing the patient because Ms. Calcagni would be seeing the patient for

---

[153] See Def.'s Statement of Material Facts (Doc. 30) at 12–13.  Dr. Stepps did not have insight into the internal investigation process.  See Stepps Dep. (Doc. 33-1) at 57.  But Dr. Stepps recalls no one asking him questions or calling him to discuss the matter.  See id.  This testimony directly conflicts with Ms. Bradley's signed Affidavit.  See Bradley Aff. Ex. 7 to Def.'s Mot. for Summ. J. (Doc. 28-7) at 1–2.  More importantly, it directly conflicts with the Defendant's Statement of Material Facts, which has been deemed admitted because Dr. Stepps did not respond to it.  See supra note 4.  See also Bradley Aff. Ex. 7 to Def.'s Mot. for Summ. J. (Doc. 28-7) at 2 ("In my conversations with Dr[.] Stepps, he could not provide any additional details other than what he wrote in his letter.  Dr. Stepps had no witnesses to any incidents of discrimination and the only document he had was the letter he sent to Dr. Schulz.  In the last discussion I had with Dr. Stepps, he stated 'I have no interest in turning this into anything.  I just want Dr. Clark to leave me alone so I can get back to work.'"); Def.'s Statement of Material Facts (Doc. 30) at 12–13 ("Bradley investigated the matter which included interviewing [Dr.] Stepps three times . . . .").

[154] See Def.'s Statement of Material Facts (Doc. 30) at 13; see also Stepps Dep. (Doc. 33-1) at 139.

[155] See Stepps Dep. (Doc. 33-1) at 57 ("I got a response back in two weeks saying that they couldn't investigate any further.").

[156] See Def.'s Statement of Material Facts (Doc. 30) at 13 (quoting Ms. Bradley's Affidavit).

[157] See id. at 9.  See also Sept. 22, 2017 Mid-Rotation Resident Feedback Form Attach. F. to Schulz Aff. (Doc. 28-1) at 56–58.  It is true that Dr. Stepps disputes this fact in his deposition testimony.  See Stepps Dep. (Doc. 33-1) at 116 ("I was not following the patient as tightly . . . . I did agree to that, that I could be tighter, and I will do better . . . .").  See also Schulz Dep. (Doc. 33-2) at 122–23 (testifying that Dr. Stepps disputed the allegation that he had not seen the patient, even though the patient had said that Dr. Stepps had not seen him).  But his deposition testimony conflicts with the Defendant's Statement of Material Facts, which has been deemed admitted because Dr. Stepps did not respond to it.  See supra note 4.

[158] See Def.'s Statement of Material Facts (Doc. 30) at 9.  Medical students were expected to conduct independent assessments of their patients, but residents assigned to the patients were still responsible for the patients assigned to the medical students and the residents were expected to document their own assessments.  See id.

him.[159]  During Ms. Calcagni's assessment of the patient, she learned that the patient had not received a chest physiotherapy machine that Dr. Stepps was supposed to order.[160]

The patient told Ms. Calcagni that he had asked the respiratory therapist about the physiotherapy machine and that the therapist noted that no order had been placed for it.[161]  The patient further explained that he had not seen Dr. Stepps "since the first few days [the patient] was [at Mercy Hospital]."[162]  The patient grew visibly upset when he learned that he might be discharged that day; he requested to be seen by an attending physician to confirm that he was ready to be discharged.[163]  Ms. Calcagni reported this encounter to Dr. Clark before rounds.[164]

When rounds began, Dr. Clark asked Dr. Stepps to present on the patient.[165]  According to Dr. Clark, Dr. Stepps "could not adequately perform" the required presentation and claimed that the patient "was doing much better with the mucous clearance device."[166]  In response, Dr. Clark pointed out that Dr. Stepps had failed to place an order for the device.[167]  And Dr. Clark emphasized that the device could not have possibly helped the patient if it had never been ordered.[168]  Following this encounter, Dr. Stepps disappeared from his rounds and did not return

---

[159] *See id.*

[160] *See id.* at 9–10.

[161] *See id.* at 10.

[162] *See id.*

[163] *See id.*

[164] *See id.*

[165] *See id.*

[166] *See id.*

[167] *See id.*  Dr. Stepps acknowledged that he failed to order the treatment.  *See* Stepps Dep. (Doc. 33-1) at 115 ("I owned the mistake.  But I didn't say, 'Oh well, the patient had physiotherapy.'  Because when the question actually came out in rounds, [Dr. Clark] looked at me, [and he said,] 'Dr. Stepps, did you order this?'  And I said, 'No, sir, I didn't.'  So of course he got upset, which, again, is understandabl[e] . . . because I made the mistake.  But I didn't tell him I ordered the chest physiotherapy.  I owned the mistake.").

[168] *See* Def.'s Statement of Material Facts (Doc. 30) at 10; Schulz Dep. (Doc. 33-2) at 51.  The record is clear that residents were expected to round on each of their assigned patients.  *See* Schulz Dep. (Doc. 33-2) at 68 ("I will say it's never acceptable not to see a patient.").  *See also id.* at 70 ("[E]verybody is expected to see every patient. . . . I've

for twenty minutes.[169]   Dr. Clark then questioned Dr. Stepps about his care of the patient.[170]

Dr. Stepps continued to claim that he had seen the patient regularly.[171]  Dr. Clark later documented

his concerns about Dr. Stepps's lack of patient care and professionalism to Dr. Schulz in the mid-

rotation resident feedback form.[172]

Around the same time as the mucous-clearance-device incident, Dr. Schulz learned that

Dr. Stepps had violated Mercy Hospital policy related to login credentials and order protocols.  On

one occasion, Dr. Stepps had given Ms. Calcagni his Mercy Hospital login credentials to the

electronic medical record system, and he requested that she enter (under his name) an order for a

chest x-ray.[173]  On that occasion, he was actually present when the order was entered.  But the

following day was a different story.  He directed Ms. Calcagni to enter an "admission order set"

under his name.[174]  Ms. Calcagni reminded him that Dr. Clark had said that medical students were

not to write orders, but Dr. Stepps pressured her to enter the admission orders and promptly left

---

actually driven back to the hospital when I've been on call seeing 75 patients a day.  Because I forgot to see somebody,
I drove back to the hospital.  You just don't--it's one of those things you don't do in medicine.  You never leave a
patient unseen.").  *See also id.* at 123 ("[Rounding to every patient is] expected of every physician.").

[169] *See* Def.'s Statement of Material Facts (Doc. 30) at 10; Schulz Dep. (Doc. 33-2) at 103.

[170] *See* Def.'s Statement of Material Facts (Doc. 30) at 10.  Dr. Schulz also questioned Dr. Stepps about the twenty-
minute disappearance, and Dr. Stepps admitted that he had left briefly.  *See* Confidential Report Ex. 12 to Def.'s Mot.
for Summ. J. (Doc. 28-1) at 32 ("I then asked [Dr. Stepps] about [whether] he [had] disappeared for twenty minutes
after this occurred, and [Dr. Stepps] said yes.  I asked [Dr. Stepps] why [he had disappeared,] and [Dr. Stepps] said
that 'he felt humiliated.'").

[171] *See* Def.'s Statement of Material Facts (Doc. 30) at 10.

[172] *See id.*

[173] *See id.* at 11.  It is a clear violation of hospital policy for a physician to give a medical student (or anyone for that
matter) his or her login credentials.  *See* Schulz Dep. (Doc. 33-2) at 24.  If a physician at Mercy Hospital were to share
his or her login credentials with anyone else, that individual would be fired.  *See id.* at 119–20.  And it is also a
violation of hospital policy for a physician to ask a medical student to log in under the physician's name to place an
order for the physician.  *See id.* at 24.

[174] *See* Def.'s Statement of Material Facts (Doc. 30) at 11.

her to carry out his directions.[175]  Ms. Calcagni chose not to enter the orders.[176]  When it was later discovered that the orders had still not been entered, Mercy Hospital staff attempted to page Dr. Stepps, but he did not respond.[177]  He was later located asleep in the resident's sleep room.[178]

On September 27, 2017, Dr. Schulz emailed Dr. Clark to request his recent evaluation of Dr. Stepps because Dr. Schulz had heard whispers from the other residents about issues with Dr. Stepps's patient care.[179]  In response, Dr. Clark explained that he had met with Dr. Stepps the previous week—after Dr. Stepps had "a very rough day[.]"[180]  Dr. Clark said he had taken that opportunity to coach Dr. Stepps on some of the deficiencies that he had observed and discussed specific notes about Dr. Stepps's performance issues.[181]  Dr. Clark documented the specific performance issues that they had discussed together.[182]  Dr. Clark also noted that he had received concerned reports from other residents and medical students that correlated with his own observations and suspicions about Dr. Stepps's performance issues.[183]

On September 30, 2017, Dr. Clark emailed Ms. Ora with concerns about deficiencies in Dr. Stepps's performance.[184]  Dr. Clark attached a recent evaluation of Dr. Stepps's performance

---

[175] *See id.*

[176] *See id.*

[177] *See id.*

[178] *See id.*

[179] *See* Sept. 27, 2017 Email from Dr. Schulz to Dr. Chris Clark Attach. F to Schulz Aff. (Doc. 28-1) at 60–61.

[180] *See* Sept. 27, 2017 Email from Dr. Clark to Dr. Schulz Attach. F. to Schulz Aff, (Doc. 28-1) at 60.

[181] *See id.*

[182] *See id.*

[183] *See id.* ("There are also a few concerning reports passed on to me from other residents and students that correlate with some things that I have both observed and suspected.  If I could get a copy of the evaluation form[,]  I would be happy to return.  I think some of the concerns that others have brought up would be better explained by them personally[,] but I can also relay their concerns in the proper venue in association with what I've seen.").

[184] *See* Sept. 28, 2017 Email from Dr. Chris Clark to Wyvonne Ora Attach. F to Schulz Aff. (Doc. 28-1) at 59.

on patient rounds.[185]  In the email, Dr. Clark explained that he had observed "a repeated pattern of behavior in regard to [Dr. Stepps's] omissions of orders and 'patient safety.'"[186]  Dr. Clark recommended that the program take steps to make "a very deliberate and involved effort to remediate [Dr. Stepps]."[187]  That was because, "[d]espite repeated coaching and countless hours working with him to bring him back to where he needs to be, [Dr. Stepps] still f[ell] short of the mark in a PGY-1."[188]  Dr. Clark concluded that he had "strong concerns about [Dr. Stepps's] ability to lead a team in regards to patient safety."[189]

On October 2, 2017, Dr. Stepps met with Dr. Rippelmeyer, Dr. Schulz, and Ms. Ora regarding the allegation that he had shared his Mercy Hospital login credentials with a medical student and had neglected to see a patient.[190]  Dr. Stepps admitted that he had shared his login information with Ms. Calcagni for the sake of expediency; he claimed that he did not realize that doing so was a cybersecurity violation or that Mercy Hospital policy prohibited medical students from entering orders.[191]  But Dr. Stepps had signed an acknowledgement of Mercy Hospital's Information Access Policy, which clearly set forth that sharing one's login information was strictly prohibited.[192]  Dr. Stepps also admitted that he had not overseen his patient as closely as he should have, but he adamantly denied that he had neglected to see his patient.[193]

---

[185] *See id.*

[186] *See id.*

[187] *See id.*

[188] *See id.*

[189] *See id.*

[190] *See* Stepps Dep. (Doc. 33-1) at 124–25; Schulz Dep. (Doc. 33-2) at 50.

[191] *See* Def.'s Statement of Material Facts (Doc. 30) at 11.

[192] *See id.* at 12.

[193] *See id.*

Dr. Schulz notified Dr. Stepps that he would investigate these allegations and Dr. Stepps's responses; if the evidence he uncovered was inconsistent with Dr. Stepps's statement, then Dr. Stepps's residency contract would not be renewed.[194]  Following this meeting, Dr. Schulz spoke directly with Mercy Hospital personnel, who communicated that Dr. Stepps was no longer welcome at Mercy Hospital.[195]

On the morning of October 6, 2017, Ms. Ora discovered an envelope addressed to Dr. Schulz from "the Residents" that someone had slid under her door.[196]  The envelope contained a letter that was not signed (leaving its origin and authors to sheer speculation).  The letter raised a litany of issues about Dr. Stepps, including his negative, even hostile, interactions with his fellow residents, multiple instances of poor patient care, misogynistic comments he made about female nurses and staff members, poor attendance and/or disengagement in meetings and conferences, his disappearance from service rotations altogether, and overall poor work ethic.[197]  "[T]he Residents" stated that Dr. Stepps "ha[d] become a toxic presence in [the] program," and "he ha[d] been harmful to the program in many ways."[198]  "[T]he Residents" believed "there w[ould] be even more severe patient care events in the future if [Dr. Stepps] continue[d] [in the program]."[199]

---

[194] *See id.*

[195] *See* Schulz Dep. (Doc. 33-2) at 24–26 (testifying that two Mercy Hospital representatives communicated to Dr. Schulz that Dr. Stepps was no longer welcome to practice medicine at Mercy Hospital).

[196] *See* Oct. 6, 2017 Email from Wyvonne Ora to Dr. Thomas Schulz Ex. To Def.'s Mot. for Summ. J. (Doc. 28-8) at 42; Def.'s Statement of Material Facts (Doc. 30) at 13.

[197] Def.'s Statement of Material Facts (Doc. 30) at 13.

[198] *See id.*

[199] *See id.*  The letter also noted that while they did not want to compromise Dr. Stepps's future, they would not feel "comfortable with him taking care of a family member or a friend" and "would not feel comfortable working at the same institution" with him.  *Id.*

Dr. Stepps did not recall his fellow residents discussing these issues with him, and he expressed surprise at the letter.[200]

## V.    Notice of Contract Nonrenewal

Dr. Stepps did not successfully complete the second PIP; according to Dr. Schulz, Dr. Stepps failed to meet the designated criteria and was still not performing at the level of a PGY2 resident.[201]   On October 16, 2017, the Committee convened for a special meeting to determine Dr. Stepps's PIP-status.[202]   At this meeting, the Committee determined that Dr. Stepps's deficiencies had surpassed the point of remediation, and the Committee unanimously decided to remove Dr. Stepps from patient care and to place him on self-study for the Step 3 exam.[203]

In December 2017, the Committee met to review the mid-year progress of all residents in the Internal Medicine Residency Program.[204]   During this meeting, the Committee ultimately determined to not renew Dr. Stepps's contract for a third year.[205]   The nonrenewal decision was made by core faculty (on the Committee) who observed Dr. Stepps on a day-to-day basis; in their opinion, Dr. Stepps was not performing to the standards necessary to maintain patient safety.[206]   UAMS distinguishes nonrenewal from termination, as the nonrenewal permitted Dr. Stepps to

---

[200] *See* Stepps Dep. (Doc. 33-1) at 126 ("I mean, that's how they feel.  Kind of shocking, but, you know, it's part of it.").

[201] *See* Schulz Aff. (Doc. 28-1) at 9 (noting that Dr. Stepps did not successfully complete the August 4, 2017 PIP); Schulz Dep. (Doc. 33-2) at 105 (testifying that Dr. Stepps "was not performing at the level of a PG[Y]2 resident.").

[202] *See* Stepps Dep. (Doc. 33-1) at 123.

[203] *See* Def.'s Statement of Material Facts (Doc. 30) at 14.  As noted above, Mercy Hospital had advised Dr. Schulz that Dr. Stepps would not be permitted to practice at its facility.  *See supra* note 195.  So Dr. Stepps was removed from all clinical duties for the remainder of his PGY2 term.  *See* Def.'s Statement of Material Facts (Doc. 30) at 14.

[204] *See* Def.'s Statement of Material Facts (Doc. 30) at 14; Schulz Aff. (Doc. 28-1) at 9.

[205] *See* Def.'s Statement of Material Facts (Doc. 30) at 14; Schulz Aff. (Doc. 28-1) at 10; Nov. 4, 2023 Summ. J. Hr'g Tr. (Rough) at 8.

[206] Schulz Dep. (Doc. 33-2) at 49.  Since this decision, the program has sent at least two other residents home for self-directed study following performance issues.  *See id.* at 46.

continue in the program for another eight months, and to continue to receive his salary, benefits, and insurance.[207]

Dr. Stepps was notified of his contract nonrenewal in December 2017.[208]  He was given the opportunity to resign when he was notified that he was being removed from his clinical duties and sent home for self-directed study to prepare for the Step 3 exam.[209]  He faced a serious choice. Per ACGME guidelines, as the Program Director, Dr. Schulz was required to prepare a summative letter at the end of each resident's time in the program.[210]  Summative letters included objective factual information regarding a resident's performance throughout the program.[211]  Dr. Stepps was informed that, if he resigned, the details surrounding the nonrenewal of his contract would be excluded from his summative letter.[212]

Dr. Stepps chose not to resign.  Consequently, the summative letter included information about the nonrenewal of his residency contract.[213]  Dr. Schulz's letter reported that Dr. Stepps had successfully completed his PGY1 year of training and a PIP during that year.[214]  The letter indicated that Dr. Stepps was placed on a second PIP in his PGY2 year, did not successfully

---

[207] *See id.* at 92.  Dr. Stepps "continued to have access to the UAMS campus and study materials, and he continued to receive his salary and benefits until June 30, 2018."  Def.'s Statement of Material Facts (Doc. 30) at 14.

[208] *See* Stepps Dep. (Doc. 33-1) at 128.

[209] *See* Schulz Dep. (Doc. 33-2) at 124–25.  *See also id.* at 90 (testifying that Dr. Stepps was removed from clinical duties in October 2017).  Around this time, two students approached Dr. Schulz and told him that they would not consider staying in the program as long as Dr. Stepps was in the program because they did not want to continue to work under him.  *See id.* at 97.  Although it was clear that Dr. Stepps would not complete the program or receive credit for his PGY2 year, the self-directed study period was designed to help Dr. Stepps prepare to pass the Step 3 exam so he could become licensed.  *See* Schulz Dep. (Doc. 33-2) at 93.  Dr. Stepps passed the Step 3 exam on his first attempt. *See id.* ("I got it on the first try.").

[210] *See* Def.'s Statement of Material Facts (Doc. 30) at 14 (citing ACGME Common Core Requirement V.A.2).

[211] *See id.*

[212] *See* Schulz Dep. (Doc. 33-2) at 125.

[213] *See* Schulz Aff. (Doc. 28-1) at 10; *see also* Summative Letter Attach. H to Schulz Aff. (Doc. 28-1) at 76–77.

[214] *See* Def.'s Statement of Material Facts (Doc. 30) at 15; *see also* Summative Letter Attach. H to Schulz Aff. (Doc. 28-1) at 76.

complete the PIP, was ultimately removed from his clinical duties, and did not receive any credit for his PGY2 year.[215]  The letter further detailed that Dr. Stepps had additional performance issues during his PGY2 year and that his contract was not renewed for another year.[216]  The letter concluded that Dr. Stepps had passed the Step 3 exam and could, in Dr. Schulz's opinion, succeed in another program *under the right circumstances*.[217]

Following his departure from the UAMS Internal Medicine Residency Program, Dr. Stepps interviewed with another residency program in 2018.[218]  Dr. Stepps contacted Dr. Schulz about the summative letter when he was applying to the other program.[219]  That program reviewed the summative letter.[220]  The summative letter was also sent to the licensing boards of Arkansas, Texas, and Louisiana upon request.[221]  Since June 2018, Dr. Stepps has not been accepted into another

---

[215] *See* Def.'s Statement of Material Facts (Doc. 30) at 15; *see also* Summative Letter Attach. H to Schulz Aff. (Doc. 28-1) at 76.

[216] *See* Def.'s Statement of Material Facts (Doc. 30) at 15; *see also* Summative Letter Attach. H to Schulz Aff. (Doc. 28-1) at 76 ("Shortly after promotion, it became evident that Dr. Stepps's medical knowledge, self-reflection skills, and managerial abilities were inadequate to successfully cope with the demands of the PGY2 year . . . . In October 2017, [Dr. Stepps] was removed from clinical duties due to professionalism issues related to direct patient care.  With this development, it came to the attention of program leadership that Dr. Stepps had strained relationships with at least some of his peers.").

[217] *See* Def.'s Statement of Material Facts (Doc. 30) at 15; *see also* Summative Letter Attach. H to Schulz Aff. (Doc. 28-1) at 76–77 ("I believe that under the right circumstances, Dr. Stepps has the capability of not only completing a residency program, but becoming an excellent physician.  He is a charismatic young man who relates to patients well.  He has done well when he works alone with an attending, and has had most difficulties when other learners are part of the team.  He must develop more effective self-reflection skills in order to recognize his deficiencies and accept responsibility.  Once he fully realizes medicine is a team sport, I have no doubt he can be successful in a training program.").

[218] *See* Schulz Dep. (Doc. 33-2) at 83–84.

[219] *See id.* at 83.

[220] *See id.*

[221] *See id.* at 84.

residency program, but he has been practicing independently as a physician.[222]  Dr. Schulz left

UAMS in July 2022 and no longer works there in any capacity.[223]

## DISCUSSION

Summary judgment is appropriate when there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law.[224]  The moving party bears the

initial burden of showing that: (1) there is an absence of a genuine dispute of material fact on at

least one essential element of the nonmoving party's case, and (2) the absence means that a

reasonable jury could not possibly find for the nonmoving party on that essential element of the

nonmoving party's case.[225]  Conversely, if the nonmoving party presents specific facts by

"affidavit, deposition, or otherwise, showing the existence of a genuine issue for trial," then

summary judgment is not appropriate.[226]  Importantly, "[t]he mere existence of a factual dispute

is insufficient alone to bar summary judgment. . . ."[227]  The dispute of fact must be both genuine

and material to prevent summary judgment.[228]  A genuine dispute of fact exists where a reasonable

jury could decide the particular question of fact for the nonmoving party.[229]

Claims of race-based employment discrimination and retaliation filed under § 1981 and

§ 1983 are analyzed under the same framework as Title VII claims.[230]  Plaintiffs either rely on

---

[222] *See* Def.'s Statement of Material Facts (Doc. 30) at 15.  In 2022, Dr. Stepps's salary as an independent physician exceeded $300,000.  *See id.*

[223] *See* Schulz Dep. (Doc. 33-2) at 106.  When Dr. Schulz left UAMS to work at Loma Linda University, he lost access to all UAMS records and has only reviewed the documents that counsel in this case provided.  *See id.*

[224] *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citing Fed. R. Civ. P. 56(c)(2)).

[225] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[226] *Grey v. City of Oak Grove, Mo.*, 396 F.3d 1031, 1034 (8th Cir. 2005) (citing *Celotex*, 477 U.S. at 317).

[227] *See Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

[228] *See id.*

[229] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[230] *See, e.g., Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 873 (8th Cir. 2010) (applying the *McDonnell Douglas* burden-shifting framework to a § 1981 discrimination claim); *Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1196 (8th

direct evidence or use the *McDonnell Douglas* burden-shifting analysis to try to establish discriminatory (or retaliatory) motive.[231]  The record in our case—as in most discrimination and retaliation cases these days—is devoid of inculpatory direct evidence.[232]  Accordingly, Dr. Stepps must rely on the *McDonnell Douglas* framework to try to make a circumstantial case for his discrimination and retaliation claims.  All parties agree on this point.[233]

## I.   Discrimination

Let's start with Dr. Stepps's discrimination claim against Dr. Schulz.  As noted above in footnote 1, the applicable statute of limitations prevents any employment event that occurred prior to October 29, 2017, from serving as the direct basis of this discrimination claim.  And the only employment event referenced in the Second Amended Complaint that occurred on or after October 29, 2017, is the nonrenewal of Dr. Stepps's contract.[234]

---

[231] Cir. 2006) (applying the *McDonnell Douglas* burden-shifting framework to § 1981 and Title VII discrimination claims); *Richmond v. Bd. of Regents of the Univ. of Minn.*, 957 F.2d 595, 598 (8th Cir. 1992) (applying the *McDonnell Douglas* burden-shifting framework to § 1981 and § 1983 discrimination claims); *see also Kim v. Nash Finch Co.*, 123 F.3d 1046, 1059–60 (8th Cir. 1997) (applying the *McDonnell Douglas* burden-shifting framework to § 1983 and Title VII retaliation claims).

[231] *See Lake*, 596 F.3d at 873 ("A plaintiff alleging race discrimination may survive summary judgment either by direct evidence, or by creating an inference of discrimination under the *McDonnell Douglas* burden-shifting framework."); *Kim*, 123 F.3d at 1066 ("Direct evidence of intentional discrimination is not required; circumstantial evidence may be sufficient.").  "[D]irect evidence is evidence 'showing a specific link between the alleged discriminatory [or retaliatory] animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that [a discriminatory or retaliatory] criterion actually motivated' the adverse employment action." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997)).  The paradigmatic example of such direct evidence would be a written statement (or even an oral remark) from Dr. Schulz to a third party that admitted, "We did not renew Dr. Stepps's residency contract because he filed a discrimination complaint against one of our doctors."  Of course, there's nothing like that in our case.

[232] *See, e.g.*, *Kim*, 123 F.3d at 1059 ("[C]ase law recognizes that intentional discrimination may be proven by circumstantial evidence because '[t]here will seldom be eyewitness' testimony as to the employer's mental processes.'") (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)).

[233] *See* Nov. 4, 2023 Summ. J. Hr'g Tr. (Rough) at 51–53, 77; Def.'s Br. in Supp. of Mot. for Summ. J. (Doc. 29) at 19–20; Pl.'s Resp. (Doc. 33) at 12.

[234] *See* Pl.'s Second Am. Compl. (Doc. 20) at ¶ 29.  The writing and sending of the summative letter discussed at the end of the Background Section also occurred after October 29, 2017.  But the Second Amended Complaint does not discuss the summative letter at all and certainly does not claim it as a basis for either the discrimination claim or the retaliation claim.

Dr. Schulz argues that he should prevail on summary judgment because, on this record, he is entitled as a matter of law to qualified immunity on this claim.[235]  In determining whether a government official is entitled to qualified immunity at summary judgment, we ask: (1) whether a reasonable jury could conclude that "the facts shown by the plaintiff make out a violation of a constitutional or statutory right," and (2) whether that right "was clearly established at the time of the defendant's alleged misconduct."[236]  Dr. Schulz correctly points out that he is "entitled to qualified immunity unless the answer to both of those questions is yes."[237]  Because the Court concludes that the answer on prong 1 is "no," the Court need not and does not reach prong 2.

Dr. Stepps must establish a *prima facie* case of discrimination.  It is Dr. Stepps's burden to establish that, on this record, a reasonable jury could conclude that: "(1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination."[238]  If Dr. Stepps successfully makes out a *prima facie* case of discrimination, the burden shifts to Dr. Schulz to articulate a legitimate, nondiscriminatory reason for the adverse employment action.[239]  If Dr. Schulz does so, then any "presumption of discrimination" from the *prima facie* case "disappears," and Dr. Stepps is "require[ed]" to provide facts from which a reasonable jury could conclude that "the proffered justification is merely a pretext for discrimination."[240]

---

[235] *See* Def.'s Br. in Supp of Mot. for Summ. J. (Doc. 29) at 30–33.

[236] *Winslow v. Smith*, 696 F.3d 716, 730–31 (8th Cir. 2012) (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009)); *see also Johnson v. Phillips*, 664 F.3d 232, 236 (8th Cir. 2011).

[237] *Winslow*, 696 F.3d at 731 (quoting *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012)).

[238] *See Burton v. Ark. Sec. of State*, 737 F.3d 1219, 1229 (8th Cir. 2013).

[239] *See id.*

[240] *Id.* (quoting *Twiggs v. Selig*, 679 F.3d 990, 993 (8th Cir. 2012)) (quotation marks omitted).

In a case like this one, where the purported reason for the challenged employment action is a plaintiff's subpar job performance, courts struggle to determine where in the *McDonnell Douglas* framework they should address the record evidence of a plaintiff's job performance. One could reasonably address that evidence under the second prong of the *prima facie* test, which asks whether a plaintiff was meeting his or her employer's legitimate expectations. Equally as reasonable, however, is addressing that evidence only in a court's assessment of whether the purported reason for the challenged employment action was pretext for discrimination. This latter scenario would require a court to skip the second prong of the *prima facie* test, instead considering the plaintiff to have successfully made out a *prima facie* case if the other three *prima facie* prongs have been met.[241] In this case, the Court need not choose between those analytical models.

---

[241] The Court is not suggesting the other three *prima facie* prongs have been met. No reasonable jury could conclude on the facts in this record that there were circumstances giving rise to an inference of discrimination with respect to the nonrenewal of the contract. Dr. Stepps does not provide evidence to show a sufficiently similar comparator—e.g., someone whose deficiencies were similar but was not nonrenewed. Dr. Stepps does not point to a single co-resident who was permitted to move through residency despite accumulating a similar laundry list of egregious performance deficiencies. Dr. Stepps asserts, without any evidentiary support, that a white male resident was placed on a PIP, and then put probation. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 33) at 13 (making a cursory reference to another resident, Dr. Shellnut). From Dr. Stepps's perspective, this is evidence that he was treated differently because he was not afforded the opportunity to be placed on probation. *See id.* But this is mere speculation at best. Plaintiff's counsel himself conceded that he did not know if the white male resident was similarly situated to his client. *See* Nov. 4, 2023 Summ. J. Hr'g Tr. (Rough) at 57. And the record contains no indication of what this other doctor did wrong or how often he did those things wrong. Dr. Stepps points to another resident, Dr. Mynam Huynh, who was placed on a PIP, required to undergo other (unidentified) remediation measures, and was eventually permitted to proceed through residency. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 33) at 13. But Dr. Huynh's deficiencies "never reached th[e] level" of Dr. Stepps's deficiencies. Schulz Dep. (Doc. 33-2) at 139 (testifying that Dr. Huynh was never given the option to resign because her deficiencies never rose to the level of non-renewing her residency contract). She was never sent home for self-study. *See id.* And she was never removed from patient care. *See id.* at 140. Nor is there is evidence that she failed to see a patient for several days, failed to order patient treatments, or committed a fireable violation of hospital policy. The bottom line is there's no evidentiary basis to suggest these doctors were similarly situated comparators.

True, an inference of discrimination can be shown even in the absence of a comparator. But the record is devoid of evidentiary support for such alternative routes. The only individual about whom Dr. Stepps provides any facts at all concerning purported racial bias is Dr. Clark. But there's no evidence that Dr. Clark was a member of the Committee that made the ultimate decision not to renew Dr. Clark's contract. *See* Stepps Dep. (Doc. 33-1) at 62 (testifying that he knew that Dr. Clark "g[ave] input to the [C]ommittee" but Dr. Stepps "d[idn't] know if [Dr. Clark was] . . . a core faculty [member]" of the Committee); Schulz Dep. (Doc. 33-1) at 37 (recalling only that "[Dr. Clark] might have been [a] core faculty" member of the Committee, rather than an adjunct faculty member of the residency program); Nov. 4, 2023 Summ. J. Hr'g Tr. (Rough) at 7 ("[Dr. Clark] was not a member of the [Committee]."). And Dr. Clark was far from the only person to raise grave problems with Dr. Stepps's performance. The leaps of logic to infer that racial discrimination infected the nonrenewal decision are just too great to be considered anything other than speculation.

However you slice it, the record—especially given all the facts deemed admitted by Dr. Stepps's failure to respond to the Statement of Material Facts—supports only one possible conclusion: Dr. Stepps's contract was nonrenewed because of his deficient performance and not based on his race.  No reasonable jury could conclude otherwise.

It is true that Dr. Stepps performed at the expected level of a first-year resident during the first seven months of his first year.  But that positive trajectory changed in February 2017, when his evaluators noted that Dr. Stepps struggled to present complete information on his patients and appeared to be unprepared during his rounds.  In the eight months following those initial negative evaluations, Dr. Stepps was twice placed on remedial PIPs for serious performance deficiencies.  Although he completed one successfully, he never completed the second one.  His evaluating faculty, based on standardized ACGME milestones, collectively and routinely documented deficiencies in his preparation, clinical knowledge, patient care, and ability to collaborate with his colleagues.  Indeed, at one point, his supervising physicians even recommended that he be temporarily demoted from a PGY2 back to a PGY1 until he made significant improvements.  The shared consensus of his supervisors in July 2017 was that Dr. Stepps was a second-year resident performing at the level of a fourth-year medical student.

Subsequently, UAMS received word from Mercy Hospital that the hospital would not let Dr. Stepps complete his rotations.  He had violated hospital policy by pressuring a medical student to place orders under his login credentials.  And Mercy Hospital doctors and staff were concerned that Dr. Stepps posed a risk to patient safety.  Dr. Stepps neglected to see his patient for several

---

Dr. Stepps offers no evidence to connect the dots.  Nor does he even suggest that Dr. Schulz or anyone else on the Committee had or acted on racial bias.  Compare that to the evidence that the residency program took a chance on admitting Dr. Stepps into the program despite a poor academic record, and that the program gave Dr. Stepps multiple chances to address his poor workplace performance.  That is not the stuff of racial discrimination.

days, failed to order a necessary treatment for that patient, and then misrepresented to Dr. Clark that he had seen the patient, ordered the treatment, and the (not-ordered) treatment had helped the patient.  After this was discovered, Dr. Stepps disappeared and was nowhere to be found.  The UAMS evaluating faculty, Mercy Hospital staff, and other residents were justifiably concerned about the escalation in his deficient performance.

In short, the record is absolutely crystal clear—again considering all the facts deemed admitted—that Dr. Stepps routinely, and severely, fell short in terms of job performance.  At the very least, the foregoing makes it impossible for a reasonable jury to conclude that the proffered reason for nonrenewal of Dr. Stepps's contract—his consistent dismal performance—was pretext.  Accordingly, Dr. Schulz is entitled to summary judgment on Dr. Stepps's § 1981 discrimination claim against him.[242]

## II.    Retaliation

Dr. Stepps's retaliation claim fares no better.  For the same reasons as discussed in the Discrimination Section, the only potentially viable employment event underlying the retaliation claim is the nonrenewal of Dr. Stepps's contract.   Under the version of the *McDonnell Douglas* framework applicable to retaliation claims, Dr. Stepps bears the burden of providing evidence from which a reasonable jury could find in his favor on each of the three *prima facie* prongs.[243]

---

[242] There is another reason Dr. Schulz is entitled to summary judgment.  He is being sued in his individual capacity and thus he can only be liable for the purported racial discrimination if he committed or caused the underlying act.  But he did not.  The nonrenewal of Dr. Stepps's contract was a consensus decision of the Committee, and there is no evidence to suggest Dr. Schulz took any steps to influence the Committee one way or the other.  In light of this, one might ask why the Court went through a fuller analysis in the main text.  The Court did so because there is some slight question as to whether Dr. Stepps's official capacity claims against Dr. Schulz (and perhaps even the UAMS Board of Trustees ) are still live.  *See* Sept. 6, 2022 Order (Doc. 19) at 6–7; Pl.'s Second Am. Compl. (Doc. 20) at ¶ 40; Nov. 4, 2023 Summ. J. Hr'g Tr. (Rough) at 2–4, 38–42.  The better view is that none of those official-capacity claims are still live.  But even if they were, the Court's fuller analysis in the main text resolves them.  (This is true for claims sounding in both discrimination and retaliation.)

[243] *Kim*, 123 F.3d at 1059–60 (applying the *McDonnell Douglas* burden-shifting framework to § 1981 and § 1983 retaliation claims).

Prong 1 is that "he . . . engaged in statutorily protected activity[.]"[244]  Prong 2 is that he suffered an "adverse employment action" as the result of the alleged retaliation.[245]  And prong 3 is that "a causal connection exists between the two events."[246]  If Dr. Stepps makes out a *prima facie* case of retaliation, Dr. Schulz must then point to "a non[-]retaliatory reason for the adverse employment action."[247]  If Dr. Schulz can point to a legitimate, non-retaliatory reason for his actions, the burden returns to Dr. Stepps, who is then obliged to present evidence from which a reasonable jury could conclude that the proffered reason is pretext for retaliation.[248]

Dr. Schulz concedes that Dr. Stepps's oral report of discrimination to Dr. Schulz in February 2017 constitutes protected activity.[249]  He similarly concedes—or at least does not contest—that Dr. Stepps's written report of discrimination to Dr. Schulz in October 2017 constitutes protected activity.[250]  And Dr. Schulz's counsel conceded that UAMS's December 2017 nonrenewal of Dr. Stepps's residency contract was an adverse employment action.[251]  So Dr. Stepps has met the first two prongs of his *prima facie* case.

All the *prima facie* action here concerns the third prong.  Dr. Schulz argues that, on this record, a reasonable jury could not conclude that Dr. Stepps established a causal connection between the protected activity and the adverse employment action.  That is, Dr. Schulz says that Dr. Stepps did not produce any evidence of a causal connection between the making of the race

---

[244] *See Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (quoting *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 914 (8th Cir. 2006)) (quotation marks omitted).

[245] *See id.*

[246] *See id.*

[247] *See id.*

[248] *See id.*

[249] *See* Nov. 4, 2023 Summ. J. Hr'g Tr. (Rough) at 11.

[250] *See* Def.'s Br. in Supp. of Mot. for Summ. J. (Doc. 29) at 29.

[251] *See* Nov. 4, 2023 Summ. J. Hr'g Tr. (Rough) at 55.

discrimination complaints and the contract nonrenewal.[252]  Dr. Schulz is right.  Dr. Stepps's *prima*

*facie* case fails because he cannot show any causal link between his complaints and the alleged

adverse employment action.

Dr. Stepps offers little support for his theory of causation.  His first protected activity

occurred ten months before he was nonrenewed.  The Eighth Circuit is abundantly clear that "[a]

gap in time between the protected activity and the adverse employment action weakens an

inference of retaliatory motive."[253]  Weeks, not months, is the touchstone here.  The Eighth Circuit

has recognized a two-week interval between the protected activity and an adverse employment

action to be "sufficient" to establish retaliatory causation, "but barely so."[254]  And a time interval

of more than two months is too long to support an inference of causation.[255]  Moreover, where

there is a delay of many months, the "causal nexus tends to evaporate" completely.[256]

The ten-month gap between the February 2017 oral complaint and the December 2017

nonrenewal is such a lengthy delay as to on its own break any asserted causal link.  But Dr. Stepps

is on somewhat different footing with respect to the October 2017 written complaint.  The gap

between this complaint and the contract nonrenewal was only around 2 months.  Unlike the ten-

month gap, a two-month gap does not on its own break a causal link.  But neither does it establish

a link—even for summary judgment purposes.  Where such a gap exists, a plaintiff must provide

---

[252] *See* Def.'s Br. in Supp. of Mot. for Summ. J. (Doc. 29) at 29–30.

[253] *See Stewart*, 481 F.3d at 1044 (quoting *Hesse v. Avis Rent-A-Car Sys., Inc.*, 394 F.3d 624, 633 (8th Cir.2005)) (alteration in original) (quotation marks omitted).

[254] *Smith v. Allen Health Sys.*, 302 F.3d 827, 833 (8th Cir. 2022).  Although *Smith* is a Title VII retaliation case, as already discussed previously in this Order, a plaintiff's burden is the same when making a retaliation claim under § 1983 or Title VII context.  *See supra* note 230.

[255] *See, e.g., Wilson v. Arkansas Dep't of Hum. Servs.*, 850 F.3d 368, 373 (8th Cir. 2017) (citing *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 92 (2d Cir. 2015)).

[256] *See Stewart*, 481 F.3d at 1044 (quoting *Shanklin v. Fitzgerald*, 397 F.3d 596, 604 (8th Cir.2005)) (quotation marks omitted).

some other evidence to allow a reasonable jury to conclude the existence of a link between the protected conduct and the adverse action.  And here there is simply no other evidence linking the contract nonrenewal to Dr. Stepps's written complaint.

In sum, Dr. Stepps has failed to provide adequate evidence from which a reasonable jury could conclude that a causal connection exists between either of his discrimination complaints and the contract nonrenewal.  Accordingly, Dr. Stepps has not made out a *prima facie* retaliation case and Dr. Schulz is entitled to summary judgment.  Moreover, even if Dr. Stepps had made out a *prima facie* case, he could not show that the proffered reason for the contract nonrenewal—his continued dismal performance—was pretext for retaliation.  In this regard, the Court adopts (instead of repeating) its conclusions from the previous section of this Order.

## CONCLUSION

For the reasons stated above, the Court GRANTS the Motion for Summary Judgment in its entirety.[257]  Judgment will be entered for Defendant.

IT IS SO ORDERED this 9th day of July 2024.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[257] Although Dr. Stepps briefly and opaquely alluded to a hostile work environment in his Second Amended Complaint, *See* Pl.'s Second Am. Compl. (Doc. 20) at ¶¶ 31–35, the record, summary judgment briefing, and oral argument make clear that Dr. Stepps is not asserting a hostile work environment claim.  If he were, there is no evidence from which a reasonable jury could conclude that the treatment to which Dr. Stepps was subjected was severe and pervasive enough to meet the relevant Eight Circuit test.  *See Williams v. Ark. Dept. of Corr.*, 438 Fed. Appx. 535, 536 (8th Cir. 2011) ("Title VII and 42 U.S.C. § 1981 claims alleging hostile work environment are analyzed under [an] identical standard . . . [when the] workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter conditions of victim's employment and create abusive working environment.").

Finally, one further word is in order on the statute of limitations.  In footnote 1 of this Order, the Court discussed one way in which the statute of limitations affects this case.  But Dr. Schulz makes a broader statute-of-limitations argument, suggesting that the statute of limitations entirely resolves this case.  *See, e.g.,* Def.'s Br. in Supp. of Mot. for Summ. J. (Doc. 29) at 18–19; Nov. 4, 2023 Summ. J. Hr'g Tr. (Rough) at 31–32.  Because Dr. Schulz prevails on the merits, the Court need not wade into the thorny statute of limitations issues raised by this broader argument.